UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

GENECCO PRODUCE, INC.,

                              Plaintiff,                    No. 04-CV-6282 CJS

      -vs-
                                                           DECISION AND ORDER

SOL GROUP MARKETING COMPANY,

                              Defendant.

_____


APPEARANCES

For plaintiffs:           David L. Rasmussen, Esq.
                          Glenn M. Fjermedal, Esq.
                          Lacy Katzen LLP
                          130 East Main Street
                          Rochester, New York 14604


For defendants:           Tim D. Henkel, Esq.
                          Silver, Garvett & Henkel, P.A.
                          18001 Old Cutler Road, Suite 600
                          Palmetto Bay, Florida 33157

                          Jerauld E. Brydges, Esq.
                          Harter, Secrest & Emery, LLP
                          1600 Bausch & Lomb Place
                          Rochester, New York 14604


INTRODUCTION

    This is an action pursuant to the Perishable Agricultural Commodities Act of

1930 ("PACA"), 7 U.S.C. § 499a *et seq*.  Plaintiff Genecco Produce, Inc. ("Plaintiff")

commenced this action against defendant Sol Group Co. ("Defendant") after the United

1

States Secretary of Agriculture ruled against plaintiff in an administrative proceeding.

Now before the Court is a motion for summary judgment [#56] by defendant.  For the

reasons that follow, the application is denied.

BACKGROUND

This action involves a dispute between the parties over payments allegedly owed

for eleven separate shipments of watermelons.  All the invoices were designated as

"FOB Pompano".[1]  The invoices further listed the amount and general type of

watermelon being sold, but not the grade of melon.  Defendant demanded payment

from plaintiff, and after plaintiff refused to pay the full amount demanded, defendant

filed a petition with the U.S. Secretary of Agriculture, pursuant to PACA, 7 U.S.C. §

499a.  A hearing was held before an Administrative Judicial Officer, who determined

that plaintiff owed defendant a total of $38,328.28, plus interest and statutory handling

fees.[2]  Plaintiff subsequently commenced this action, pursuant to 7 U.S.C. § 499g(c).

During discovery, defendant took the deposition of David Genecco ("Genecco"),

plaintiff's president.  Genecco testified regarding his dealings with defendant's sales

representative, Al Guzi ("Guzi"), generally as follows:

> Al Guzi would call me up in the morning and say, you know, 'I've got three
> or four loads of cantaloupes to move.  Help me out.'  Okay?  I'd say,
> 'What have you got to have for them?'  And he would say, 'Well, do the
> best you can.'  So we'd get the melons, I would send him two or three
> trucks that day for an example.  We'd send the melons or cantaloupes,
> watermelons, whatever it was to where they went to.  If the melons were

---

[1]F.O.B. means, in relevant part,  "that the produce quoted or sold is to be placed free on board the boat, car, or other agency of the through land transportation at shipping point, in suitable shipping condition . . . and that the buyer assumes all risk of damage and delay in transit not caused by the seller irrespective of how the shipment is billed." 7 C.F.R. § 46.43(i)

[2]Apart from a verified Answer, plaintiff did not submit any evidence in the administrative proceeding. *See*, Guzi Aff. [#59] Ex. 2 pp. 1-2

good, they were accepted by the customer, I paid the man in full whatever
we agreed on.  [If] [t]he melons were bad . . .  the customer got an
inspection, we faxed him [Guzi] the inspection on the load.  And he told
me to do the best I could [o]n several occasions and sometimes the best
you could do [was that] the product was not salable.

*** 

[When I could sell the melons] I would tell [Guzi] what I got for the stuff
and he sent me a bill.

***

[Where there was a problem with a load,] [t]he customer would call me, I
would call Al [Guzi] and I told Al that, 'Listen, this guy is not liking this.'
And he says, 'Well, get an inspection." . . .  So we get an inspection, I fax
him the inspection, I say — call Al back.  'Al, what do you want to do?'  He
says, 'Will the guy work the load?  Will he do the best he can?  Will he
handle the load?'  Sometimes the customer would, sometimes the
customer wouldn't.  If the customer would handle the load, they did, we
returned them what he had.  And if they wouldn't handle it, sometimes you
had more money in freight than you could get for the stuff.

(Genecco Dep. pp. 24, 27, 30-31; 165-68 ) Genecco testified that he and Guzi

understood that the sales were not actually f.o.b.:

Q. Did you send anything in writing back to Mr. Guzi disagreeing with the
FOB Pompano designation on the document?

A. Listen.  He knew we had a common relationship that I would send
trucks to him an he put a price on the bill what it should be FOB and I paid
for the freight.  And as long as the stuff was good, I paid the freight and he
gave me a bill for whatever the stuff was.  Okay?  As far as me being
responsible for the fruit when it left that place, that was never the case.

***

Q. Mr. Genecco, did you send anything in writing to [defendant]
disagreeing that the terms of this invoice were Pompano FOB?

A. I never agreed to it and I never disagreed to it.

***

Q. So you're refusing to tell me whether you sent anything in writing . . .
[about] whether you disagreed with Pompano FOB[?]

A. I may never have done it in writing but we had a mutual understanding
the way the deal was.  I mean, we didn't just do *this load*, we did
thousands of loads.

(*Id*. at 48-50; *see also, Id.* at 106-107) (emphasis added)  Genecco also testified that,

while defendant's invoices did not refer to a grade of produce, there was an

understanding that the produce should be USDA No. 1:

> Q. . . . . [D]id you ever send anything in writing to [defendant] advising [it]
> or Mr. Guzi that the terms of this sale invoice . . . were for a USDA grade
> – a specific grade of the USDA melon?
>
> A. Mr. Guzi knows the places that I sell to.  He knows that the stuff needs
> to be U.S. Number 1 to get into the chain store people.  And he knows
> that if it's not received by the chain store customers that I would handle it
> for him on the street.  They why he used me.  He – again, we're in a
> verbal mutual respect area.  As far as being on the paper, it's probably not
> on the paper, no.
>
> ***
>
> Q. Did you tell him you want a specific grade of USDA melon for *this
> transaction*?
>
> A. He knows that they've got to be good and they've got to be able to be
> sold.
>
> Q. When I say 'did you tell' am I not – is that – am I not –
>
> A. I'm not sure.
>
> ***
>
> Q. Okay.  When you say you're 'not sure', does that – is that a memory
> issue or something else?  In other words you don't remember?
>
> A. No, I'm not sure.  I may have, I may not have. I don't know.

(*Id*. at 57-59 ) (emphasis added)  Genecco testified that he did not have any specific

recollection of sending inspection reports to Guzi concerning the eleven sales at issue

here, but he is convinced that he did so promptly because that was his standard

practice. (*See, Id.* at 97-99; 127-28; 153)

Defendant filed the subject motion for summary judgment [#56], and in support

of the motion, submitted the Secretary's Decision and the full administrative record.[3]

---

[3]As will be discussed further below, although 7 U.S.C. § 499g(c) provides for a *de novo* review of
the matter in the District Court, the Secretary's findings of fact are treated as prima facie evidence in this
proceeding.

Defendant also submitted an affidavit from Guzi.  In his affidavit, Guzi states that Genecco never objected to any of the terms in defendant's invoices. (Guzi Aff. [#59] ¶ 5) Guzi further denies that he ever agreed that the sales were anything other than f.o.b. sales, or that plaintiff was not bound by the sales price on the invoices. (*Id*. at ¶ 6) Guzi further states that all of the sales were made without any designation as to grade. (*Id*. at ¶ ¶  10, 14)  Finally, Guzi states that Genecco did not inform him of inspection results in a timely manner, but instead, faxed the inspection reports days or weeks later. (*See, e.g., Id*. at ¶ ¶ 11-12, 17)

In opposition to the motion, plaintiff submitted, *inter alia*, an affidavit from Genecco.  In his affidavit, Genecco states that, as to each of the eleven sales at issue in this case, he and Guzi orally agreed that the sale was to be a consignment sale, not an f.o.b. sale, and that the melons were to be USDA Grade 1.  Genecco further contends that there was no agreement as to price, but instead, he agreed to pay defendant "based on what he could get for the watermelons." (Genecco Aff. [#66] ¶ 9). Genecco states that, consequently, defendant's invoices were all incorrect, since they did not reflect the oral agreements.  Genecco states that after receiving each invoice, he called Guzi and objected, and that, "Mr. Guzi would tell me not to worry about what was written, and we would discuss the true terms of the sale on the telephone." (*Id*. at ¶ 7).  Genecco states that, "because of the amount of business conducted between [them]", he relied on Guzi's oral representations. (*Id*. at ¶ 8) Genecco states that, whenever he had a shipment of melons inspected, he "would immediately contact Mr. Guzi and let him know there was a problem", and further, that he "was rejecting the watermelons". (*Id*. at ¶ 13) Genecco states that he "believes" he faxed the inspection

reports to Guzi, and that he considered these faxes to be "final rejection notice[s]."[4]
(*See, e.g., Id*. at ¶ 28)  Genecco states that, after rejecting the melons, "Guzi would
either instruct [him] to sell as many of the watermelons as [he] could, and get as much
as possible for the saleable watermelons, or he would instruct [him] to get a dump
certificate." (*Id*. at ¶ 14)

Counsel for the parties appeared before the undersigned for oral argument on
January 26, 2006.  Subsequently, both parties submitted supplemental briefs.  The
Court has thoroughly considered the parties' submissions and the arguments of
counsel.

ANALYSIS

The standard for granting summary judgment is well established. Summary
judgment may not be granted unless "the pleadings, depositions, answers to inter-
rogatories, and admissions on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party is entitled to a judg-
ment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears
the burden of establishing that no genuine issue of material fact exists. *See, Adickes v.
S.H. Kress & Co*., 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie
showing that the standard for obtaining summary judgment has been satisfied." 11
Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.).  In moving for
summary judgment against a party who will bear the ultimate burden of proof at trial, the
movant may satisfy this burden by pointing to an absence of evidence to support an

---

[4]Genecco does not claim to have faxed inspection reports as to two of the shipments, namely,
those reflected in Invoice 10972 and Invoice 11704.

6

essential element of the nonmoving party's claim. *See, Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986). Once that burden has been established, the burden then shifts to

the non-moving party to demonstrate "specific facts showing that there is a genuine

issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986).To carry this burden, the non-moving party must present evidence sufficient

to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. Summary judgment is

appropriate only where, "after drawing all reasonable inferences in favor of the party

against whom summary judgment is sought, no reasonable trier of fact could find in

favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Plaintiff brought this action pursuant to 7 U.S.C. § 499g(c), which states, in rele-

vant part:

> **Appeal from reparation order; proceedings**
> Either party adversely affected by the entry of a reparation order by the
> Secretary may, within thirty days from and after the date of such order,
> appeal therefrom to the district court of the United States . . . .  *Such suit in
> the district court shall be a trial de novo and shall proceed in all respects
> like other civil suits for damages, except that the findings of fact and order
> or orders of the Secretary shall be prima-facie evidence of the facts therein
> stated. . . .*

7 U.S.C.A. § 499g(c) (emphasis added).  All this essentially means, however, is that on a

motion for summary judgment in a PACA case, the "Secretary's findings [have]

conclusive effect unless effectively rebutted." *Frito-Lay, Inc. v. Willoughby*, 863 F.2d

1029, 1033 (D.C. Cir. 1988).  The prima facie validity given to the Secretary's findings

creates a burden of production, which the non-moving party may satisfy by setting forth

"specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Frito-*

*Lay, Inc. v. Willoughby*, 863 F.2d at 1032-33.

PACA provides that it is unlawful "[f]or any dealer to reject . . . without reasonable

cause any perishable commodity bought or sold or contracted to be bought, sold, or

consigned in interstate or foreign commerce by such dealer." 7 U.S.C. § 499b(2).  PACA

further makes it unlawful for any "commission merchant, dealer, or broker" to "fail or

refuse truly and correctly to account and make full payment promptly." 7 U.S.C. §

499b(4).  The Uniform Commercial Code ("UCC") applies to sales of produce under

PACA, "where PACA is silent as to a material part of the transaction at issue."

*Tray-Wrap, Inc. v. Meyer*, No. 90 Civ. 7688 (DLC), 1994 WL 710804 at *4 (S.D.N.Y.

Dec. 20, 1994), *aff'd* 71 F.3d 404 (2d Cir. 1995).

Here, defendant, citing UCC § 2-201(2), contends that plaintiff is bound by the

terms of the invoices, because plaintiff did not object to them in writing within ten days.

(Def. Reply Brief [#68] p. 3)  Article 2 of the UCC requires, with some exceptions not

relevant here, that contracts for the sale of goods costing $500 or more be in writing.

U.C.C. § 2-201(1) (McKinney 2006)[5]  The U.C.C. further provides, in relevant part:

> Between merchants if within a reasonable time a writing in confirmation of
> the contract and sufficient against the sender is received and the party
> receiving it has reason to know its contents, it satisfies the requirements
> of subsection (1) against such party unless written notice of objection to
> its contents is given within ten days after it is received.

U.C.C. § 2-201(2) (McKinney 2006); FSA 672.201(2).  As indicated, the objection under

this section of the UCC must be made in writing, not orally. 2 ANDERSON U.C.C. § 2-

201:245 (3d. ed.) ("An oral objection, whether face to face or by telephone . . . has no

effect and is the same as though no objection had been made by the receiving

merchant.")  However, there is no statute of frauds issue in this case, as both sides

---

[5]The parties dispute whether it is New York's or Florida's version of the UCC that should govern.
However, the relevant terms of both states' codes are identical.

8

agree that there was an agreement.  Accordingly, UCC § 2-201(2) is not applicable.

Moreover, under § 2-201(2), a failure to make written objection to a confirmatory writing

does not bind the receiving party to the *terms* of the writing in any event. *Bazak Int'l*

*Corp. v. Mast Indus., Inc.*, 73 N.Y.2d 113, 122-23, 538 N.Y.S.2d 503, 507-8 (1989)

("The consequence of a failure to give timely written notice of objection to a

confirmatory writing is only to remove the bar of the Statute of Frauds.  The burden of

proving that a contract was indeed made remains with the plaintiff, as does the burden

of proving the terms of the contract. . . .  Thus, UCC 2-201(2) neither binds the

receiving merchant to an agreement it has not made nor delivers an undeserved

triumph to the sending merchant."); *see also, General Matters, Inc. v. Penny Prods.,*

*Inc.*, 651 F.2d 1017, 1020 (5th Cir. 1981) ("[T]he terms of a unilateral confirmatory

writing that satisfies the statute of frauds are not conclusive evidence of the terms of an

agreement.") (construing FSA § § 672.201 and 672.202)

On the other hand, a merchant may become bound by different or additional

terms contained in a written acceptance if he fails to object to them.  In that regard,

UCC § 2-207 states, in relevant part:

> (1) A definite and seasonable expression of acceptance or a written
> confirmation which is sent within a reasonable time operates as an
> acceptance even though it states terms additional to *or different from*
> those offered or *agreed upon*, unless acceptance is expressly made
> conditional on assent to the additional or different terms.

> (2) The additional terms are to be construed as proposals for addition to
> the contract. *Between merchants such terms become part of the contract*
> *unless*:
>> (a) the offer expressly limits acceptance to the terms of the
>> offer;
>> (b) *they materially alter it; or*

> (c) *notification of objection to them has already been given*
> *or is given within a reasonable time after notice of them is*
> *received.*

NY UCC § 2-207 (McKinney 2002); FSA § 672.207 (emphasis added).  Here, however,

plaintiff claims both that defendant's invoices materially altered the parties' oral

agreements, and that it immediately objected to the invoices.  Notably, under UCC § 2-

207(2)(c), the objection need not be in writing. 2 ANDERSON U.C.C. § 2-207:130 (3d ed.)

("When an objection to an additional term is made by a party, it may be made in any

form.  The only reference made in the Code is to a 'notification of objection' that is

'given', and, thus, there is no requirement that the notice be in writing.") Consequently,

there are issues of fact concerning the terms of the parties' agreements.

Defendant also contends that UCC § 2-202, the UCC's parol evidence provision,

bars plaintiff from introducing parol evidence that contradicts defendant's invoices.

However, § 2-202 would only bar plaintiff from presenting contradictory parol evidence if

there was an agreement confirmed in written memoranda by each of the parties, or

"otherwise set forth in a writing intended by the parties as a final expression of their

agreement." N.Y. U.C.C. § 2-202 (McKinney 2002); FSA § 672.202.  As one

commentator has written,

> [u]nder UCC § 2-202, a confirmatory memorandum or a written contract
> does not bar the introduction of parol evidence until it is determined by the
> court that the writing was intended as the final and exclusive statement of
> the parties' agreement.  The mere fact that there is a writing does not give
> rise to any conclusion, inference, or presumption that the parties intended
> the terms to be final. The mere fact that there is a written agreement does
> not establish that the writing is the final or entire agreement of the parties.

2 ANDERSON U.C.C. § 2-202:43 (3d. ed.) (footnotes omitted)  Moreover, even if the

Court were to find that the invoices represented the parties "final expression of their

agreement", plaintiff would still be entitled to explain or supplement the writing(s) "(a) by course of dealing or usage of trade (Section 1-205) or by course of performance (Section 2-208); and (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." N.Y. U.C.C. § 2-202 (McKinney 2002); FSA § 672.202.

Here, the Court finds that there are issues of fact as to whether the parties intended defendant's invoices to be the final expressions of their agreements.  For example, plaintiff never signed the invoices or otherwise affirmatively indicated that it agreed with them. *City of Boca Raton v. Gold Coast Construction*, 410 So.2d 174, 175 (5th Dept. (FL) 1982) ("Section 672.202, Florida Statutes (1975), did not prohibit the trial court from considering evidence outside these two unilateral memoranda: [Plaintiff's] bid . . . was not signed by [defendant]."); *Shop Vac Corp. v. BCL Magnetics, LTD.*, No. 04-CV-262, 2005 WL 2739161 at *5 (N.D.N.Y. Oct. 24, 2005) (Holding that it was "unclear" whether a purchase order constituted the parties' final expression, because it was not signed); *compare with Sintershoe Inc. v. Bankers Trust Co.*, 77 N.Y.2d 517, 569 N.Y.S.2d 333 (1991) (Finding that a confirmation slip was a final expression of the parties agreement where it was signed and contained the relevant terms); *Alaska Russia Salmon Caviar Co., Inc. v. M/V "Marit Maersk"*, No. 98 Civ. 7685 (DLC), 2000 WL 145124 at *3 (S.D.N.Y. Feb. 2, 2000) (Finding, that an agreement was a final expression of the parties' agreement under UCC § 2-202, where "[t]he contract, *signed by both parties* and requiring changes or additions to be in writing, [was] complete and final on its face.") (emphasis added) *and Battista v. Radesi*, 112 A.D.2d 42, 491 N.Y.S.2d 81 (4th Dept. 1985) (Finding that an invoice was a final expression of the

parties agreement where it was signed and contained all relevant terms). Moreover,

plaintiff states that he routinely called Guzi and objected each time he received one of

defendant's invoices, though Guzi denies this. In any event, on many of the invoices,

Genecco crossed out the price term and wrote new prices, along with amounts

representing his brokerage fees. Finally, on at least one occasion defendant requested

that plaintiff provide a "price return", suggesting that, notwithstanding the invoice, the

amount due to defendant was going to be computed based upon the price for which

plaintiff had actually been able to sell the produce. (*Id*. at Ex. 39) Consequently, there

are issues of fact as to whether the agreements were f.o.b. or consignment sales.

There are also issues of fact as to whether the parties agreed to the grade of the

watermelons. As discussed earlier, plaintiff contends that the parties agreed that the

melons would be USDA No. 1, while defendant contends that the melons did not have

to be any particular grade. Accordingly, there are conflicting sworn statements on this

point. Additionally, on several occasions, defendant completed internal "Notice of

Complaint" forms, noting that plaintiff was complaining that the produce had failed to

grade USDA No. 1, and adjusting the price downward, which could suggest that there

was an agreement as to grade. (*See*, Guzi Aff. [#59] Exs. 8, 13, 21)

Finally, there are issues of fact as to whether or not plaintiff rejected the

shipments in a timely manner. In that regard, the UCC provides:

> If goods fail to conform to the contract, the buyer may "reject the whole."
> UCC § 2-601. The only requirement for notification of rejection is that it be
> made "seasonally." UCC § 2-602.[6] Specifically, there is no requirement
> that rejection be in writing. Moreover, "a merchant buyer is under a duty
> after rejection of goods in his possession or control to follow any

---

[6]FSA § 672.602 is identical to NY UCC § 2-602.

reasonable instructions received from the seller with respect to the goods and in the absence of such instructions to make reasonable efforts to sell them for the seller's account if they ... threaten to decline in value speedily." UCC § 2-603.

*Four Seasons Wear, Inc. v. Titan Enters.*, No. 90 Civ. 7157 (MBM), 1991 WL 113295 at *3 (S.D.N.Y. Jun. 20, 1991)[7] Here, defendant contends that plaintiff's rejections were untimely, since plaintiff did not fax the inspection reports to defendant until long after the inspections were performed.  However, Genecco maintains that he always gave defendant notice of rejection by telephone the same day that the inspections were performed.

Defendant contends that the Court should disregard Genecco's affidavit, because it contradicts his earlier deposition testimony on such matters as whether he discussed the f.o.b. terms with Guzi, whether he and Guzi agreed as to the grade of melon, and whether he objected to the invoices.  In that regard, it is well settled that a party may not defeat a summary judgment motion by submitting an affidavit that contradicts his earlier sworn deposition testimony. *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).  Moreover, the Court agrees that Genecco's affidavit conflicts somewhat with his deposition testimony.  However, even if the Court were to rely solely on his deposition testimony, the Court would still find that there are triable issues of fact.  Drawing all reasonable inferences in plaintiff's favor from Genecco's testimony, it appears that the parties engaged in possibly thousands of similar transactions, and that, while he could not remember discussing these particular eleven invoices with Guzi, he believed that, during the course of their business

---

[7]See also, 14 WILLISTON ON CONTRACTS § 40:16 (4th ed.) (Stating that, with regard to UCC § 2-602, "[i]t is generally recognized that the buyer's notice of rejection can be oral".)

relationship, the parties had reached a standing agreement that was contrary to what was contained in the invoices.  Furthermore, while he could not specifically remember objecting to the invoices or rejecting the eleven shipments at issue here, he believed that he had done so since it was his habit to do so.

CONCLUSION

For all of the foregoing reasons, defendant's summary judgment motion [#56] is denied.

So Ordered.

Dated: Rochester, New York
      February 9, 2006

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge